# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**KELLY L. DEFFINGER,**

      **Plaintiff,**

      **Case No. 1:18-cv-258**
      **JUDGE DOUGLAS R. COLE**

    **v.**
      **Magistrate Judge Litkovitz**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

## OPINION AND ORDER

This cause comes before the Court on the Magistrate Judge's August 16, 2019 Report and Recommendation ("R&R") (Doc. 14) recommending that this Court affirm the Commissioner of Social Security's decision and dismiss Kelly Deffinger's ("Plaintiff," "Claimant," or "Deffinger") Complaint (Doc. 1). As required by 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), this Court has made a de novo review of the record. For the reasons more fully set forth below, the Court **OVERRULES** Deffinger's Objections (Doc. 15) and **ADOPTS** the Magistrate Judge's R&R (Doc. 14). Accordingly, the Court **DISMISSES** Deffinger's Complaint (Doc. 1) **WITH PREJUDICE**.[1]

---

[1] Two days ago, the Sixth Circuit issued its decision in *Ramsey v. Commissioner of Social Security*, --- F.3d ----, Nos. 19-1579/1581/1586/1889/1977/3886, 2020 WL 5200979 (6th Cir. Sept. 1, 2020), holding that decisions issued by ALJs in the Social Security Administration before July 16, 2018, are subject to challenge under the Appointments Clause, and that such challenges do not require administrative exhaustion before presentation in the course of judicial review. Here, the ALJ issued his decision on April 12, 2017, and thus that decision ostensibly would be subject to challenge under *Ramsey*. At the same time, the Sixth Circuit has held, more than once, that "Appointments Clause challenges are 'not jurisdictional and

## BACKGROUND

This case originates from Deffinger's denial of social security benefits. She filed protectively for an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") for the second time[2] on October 22, 2014. (*See* Administrative Law Judge ("ALJ") Hr'g Decision, Doc. 3-2, Tr.[3] 10, #26). In that application, she alleged a disability onset date of June 22, 2013, due to an injury that caused herniated discs in her neck and lower back, bulging discs in the middle of her spine, depression, and anxiety. (R&R, Doc. 14, #725). Her applications were denied

---

thus are subject to ordinary principles of waiver and forfeiture.'" *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) (quoting *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 678 (6th Cir. 2018)). Those "ordinary principles of waiver and forfeiture," *see Jones Bros.*, 898 F.3d at 678, include the principle that issues not presented to the Magistrate Judge are deemed waived. *See, e.g., Berry v. Specialized Loan Servicing, LLC*, No. 2:18-cv-02721, 2020 WL 4698318, at *4 (W.D. Tenn. Aug. 13, 2020) (citing *Marr v. Foy*, No. 1:07-cv-908, 2010 WL 3061297, at *4 (W.D. Mich. Aug. 3, 2010) (quoting *Allen v. Int'l Truck & Engine Corp.*, No. 3:07-cv-361, 2009 WL 863591, at *1 (S.D. Ohio Mar. 31, 2009) ("'The failure to raise [an] argument before the Magistrate Judge constitutes [] waiver' of the argument.")))). That is because, as the Sixth Circuit has observed, the Magistrate Judge Act, 28 U.S.C. § 631, "does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate," *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000), a position that the Sixth Circuit continues to endorse. *Maloney v. Robinson*, No. 20-3026, 2020 WL 3791945, at *4 (6th Cir. May 15, 2020) (citing *Murr*, 200 F.3d at 902 n.1) ("This claim is waived because it was not raised until his objections to the magistrate judge's first report and recommendations."). Similarly, a party waives any issues not raised in his or her objections to the Magistrate Judge's R&R. *Hogan v. Cleveland Ave. Rest., Inc.*, No. 2:15-cv-2883, 2020 WL 5201081, at *3 (S.D. Ohio Sept. 1, 2020) (citing *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007)) ("Even when timely objections are filed, appellate review of issues not raised in those objections is waived."). Bottom line, Deffinger waived any potential Appointments Clause challenge here twice—first, by failing to raise it with the Magistrate Judge, and second by failing to raise it in her objections to the R&R.

[2] Deffinger first filed for disability benefits in 2011, alleging a disability onset date of March 7, 2011. (*See* Doc. 3-3, Tr. 71, #88). On June 21, 2013, the ALJ issued her decision denying Deffinger benefits. (*See id.* at Tr. 89, #106). Deffinger then amended her onset date on June 22, 2013—the onset date she used in her second application for benefits. (*See* Doc. 3-2, Tr. 10, #26).

[3] Citations to "Tr." refer to the administrative record generally.

initially and upon reconsideration. (*Id.*). Through counsel, Deffinger requested a de novo hearing, which was granted. (*Id.*).

That hearing, held before ALJ Peter J. Boylan, occurred on February 24, 2017. (ALJ Hr'g Decision at Tr. 10, #26). Both Deffinger and a vocational expert testified. (*Id.*). About two months later, on April 12, 2017, the ALJ issued a decision denying Deffinger's DIB and SSI applications. (*Id.* at Tr. 21, #37). In making this decision, the ALJ recognized that he was bound under principles of administrative res judicata because of the previous ALJ's findings as to Deffinger's residual functional capacity ("RFC"). (*Id.* at Tr. 10, #26). Nonetheless, the ALJ determined that "the updated medical evidence demonstrates material changes that merit slight changes to the findings of fact identified in the prior decision." (*Id.*).

In denying Deffinger benefits, the ALJ considered many different types of evidence, including the opinions of Deffinger's psychologist Dr. Kevin Murphy, and state agency psychologists Paul Tangeman, Ph.D., and Jaime Lai, Psy.D. Each doctor's opinion and the ALJ's evaluation of them are discussed in turn.

## A.    Psychologist Dr. Murphy's Opinion.

Deffinger's attorney referred her to Dr. Kevin Murphy, Ph.D., for an evaluation in August 2011. (*See* Doc. 3-7, Tr. 442–44, #463–65). During this evaluation, Deffinger complained of depression. (*See id.* at Tr. 443–44, #464–65). Dr. Murphy observed that Deffinger became depressed and tearful when describing the changes in her mood and behavior, which occurred after she suffered a back injury at work in March 2010. (*See id.* at Tr. 443–44, #464–65). Deffinger told Dr. Murphy that she felt her former

3

employer resented having to take her back on light-duty status after the incident, and that her supervisors and coworkers harassed her because of it. (*Id.* at Tr. 443, #464). She admitted to being depressed, crying every other day, having low energy, sleeping poorly, experiencing a variable appetite and more irritability, socializing less, and living in isolation. (*Id.*). Deffinger also said she had significant anxiety, felt nervous and tense most of the time, and had trouble concentrating and focusing. (*Id.* at Tr. 444, #465). At the time, she did not take any antidepressant medication to relieve her symptoms. (*Id.*). Dr. Murphy diagnosed Deffinger with depressive disorder and recommended ongoing psychotherapy and possible psychotropic medication. (*Id.*).

Deffinger did not see Dr. Murphy again until October 2014, more than three years after the initial visit. (*See id.* at Tr. 439, #462). He notes that the "long delay" resulted from her "getting approved for this condition" through worker's compensation. (*See id.*). During the 2014 examination, Dr. Murphy reported that Deffinger was "more depressed and anxious than she was in the [2011] evaluation." (*Id.*). Deffinger reiterated that she experienced frequent crying spells, low energy, suicidal thoughts (but with no plan), irritability, poor sleep, and no appetite. (*Id.*). She tried taking Cymbalta for depression, but she stopped taking it because it made her fatigued. (*Id.*). Dr. Murphy wrote that he would "be taking a straightforward cognitive behavioral approach to help with her depression and anxiety." (*Id.*). He recommended at least six more months of psychotherapy every other week. (*Id.*).

While Deffinger was going through the social security disability process, Dr. Murphy completed interrogatory responses twice—once in December 2014 during the Commissioner's initial consideration of Deffinger's applications, and again in March 2015 on reconsideration of those applications. (*See id.* at Tr. 390–92, 525–27, #411–13, 546–48). These interrogatories are essentially a list of form questions that require written responses from treating physicians or health care providers. In the December 2014 interrogatories, Dr. Murphy stated that he last saw Deffinger on December 29, 2014. (*Id.* at Tr. 390, #411). In the March 2015 interrogatories, Dr. Murphy reported that he last saw Deffinger on January 29, 2015. (*Id.* at Tr. 525, #546). (While not particularly relevant to the analysis here, it is perhaps worth noting that Deffinger did not provide, in connection with her administrative hearing, any records from Dr. Murphy reflecting either of these alleged visits.)

In his responses to both sets of interrogatories, Dr. Murphy reported that Deffinger experienced poor concentration, low frustration tolerance, and a very poor tolerance for stress. (*Id.* at Tr. 391–92, 526–27, #412–13, 547–48). But he did note that her symptoms had responded to treatment. (*Id.* at Tr. 392, 527, #413, 548). He also rated her symptoms as having a minimal restriction on her daily activities, a moderate effect on her self-care, and causing moderate problems with her social interactions, especially as it related to the general public or coworkers/supervisors. (*Id.* at Tr. 391, 526, #412, 547).

**B.      State Agency Psychologists Dr. Tangeman's And Dr. Lai's Opinions.**

Two state agency psychologists reviewed Deffinger's case as part of the social security disability process. Dr. Tangeman first reviewed the record in February 2015 on initial consideration. (*See* Doc. 3-3, Tr. 101–13, #118–30). Then Dr. Lai reviewed the record for reconsideration purposes in May 2015. (*See id.* at Tr. 129–45, #146–62). Both Drs. Tangeman and Lai concluded in their written opinions that Deffinger is limited to simple, routine, and repetitive tasks with no more than occasional (if any) decision making or workplace changes. Both doctors said they were adopting the 2013 ALJ's RFC decision under AR-98-4 (the *Drummond* Ruling).[4] (*Id.* at Tr. 107, 138, #124, 155).

They both found Deffinger to be "fully credible" (*id.* at Tr. 108, 139, #125, 156), but they also noted the almost three-year gap between Dr. Murphy's 2011 initial psychological evaluation of Deffinger related to her work injury and the start of therapy in October 2014. (*Id.* at Tr. 108, 139, #125, 156). Because of this gap between 2011 and 2014, Dr. Tangeman, in his written opinion, assigned "other" weight to Dr. Murphy's December 2014 interrogatory responses.[5] (*Id.* at Tr. 108, #125). Dr. Tangeman also pointed out that Dr. Murphy said Deffinger had poor frustration

---

[4] In *Drummond v. Commissioner of Social Security*, 126 F.3d 837, 841 (6th Cir. 1997), the Sixth Circuit held that the Social Security Administration's determination concerning a claimant's eligibility for social security benefits is subject to administrative res judicata. "When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* at 842.

[5] It is not clear from the administrative record that Dr. Tangeman had access to Dr. Murphy's October 1, 2014 treatment summary when Dr. Tangeman undertook his review. Dr. Tangeman's report, though, does indicate that he knew she began receiving treatment for her depressive condition again in October 2014.

tolerance and poor concentration, but at the same time said these symptoms imposed only minimal restrictions on her activities of daily living. (*Id.*). Dr. Lai, on the other hand, also had access to Dr. Murphy's October 2014 treatment summary, which he gave "great" weight, noting that his "statements appear to support the worsening alleged by the claimant of her symptoms as he states more [sic] depressed, crying." (*Id.* at Tr. 139, #156). But Dr. Lai agreed with Dr. Tangeman's conclusion that Dr. Murphy's December 2014 interrogatory responses were entitled to "other" weight for the same two reasons that Tangeman had identified: first, the gap in treatment between the initial evaluation in 2011 and the start of treatment in October 2014; and second, the fact that Dr. Murphy indicated Deffinger's poor frustration tolerance and inability to concentrate resulted in only minimal restrictions on her activities of daily living. (*Id.*).

## C.  The ALJ's Decision.

When evaluating the psychological opinions given by Drs. Murphy, Tangeman, and Lai, the ALJ afforded Dr. Murphy's opinion little weight, and Drs. Tangeman and Lai's opinions some weight. (ALJ Hr'g Decision at Tr. 19, #35). As for Dr. Murphy, the ALJ found specifically that the opinions set forth on his 2015 questionnaire were entitled to little weight because he offered no supporting evidence for his claims that Deffinger had "poor" concentration, "very poor tolerance for stress," and a "moderate" impairment in social interaction, and because he failed to elaborate on his "briefly worded, rather ambiguous responses." (*Id.*). The ALJ also found Dr. Murphy's report to be "inconsistent with the rest of the medical record," which indicated that Deffinger

7

"repeatedly denied any mental health complaints" (it appears that when she visited medical care providers in connection with her physical ailments, she was often asked a series of screening questions, including whether she had depression), and showed that Deffinger had engaged in a significant level of activity since the alleged onset date. (*Id.*). The ALJ afforded Drs. Tangeman and Lai's opinions "some weight," on the other hand, because their reports included at least a brief discussion of the mental health evidence and identified limitations that were largely consistent with the record during the hearing. (*Id.*).

While the ALJ declined to fully adopt the doctors' opinions, he nevertheless gave Deffinger "the benefit of the doubt that she had some worsening of her mental health impairments," as she had claimed was the case both during the one time she met with Dr. Murphy and at the hearing. Thus the ALJ "added new limitations on the claimant's social functioning." (*Id.*). The ALJ drew the line there, however, because "[t]he record does not merit additional limitations given the near total lack of mental health complaints or treatment since the alleged onset date and the claimant's wide range of activities since the alleged onset date." (*Id.*).

In addition to the doctors' opinion evidence, the ALJ reviewed the record and evaluated Deffinger's subjective complaints. Deffinger claimed she suffered from concentration deficits and indicated that she could not maintain her attention for more than five minutes at a time. (*Id.* at Tr. 14, #30). But, Deffinger also stated at the hearing that she engaged in various activities requiring sustained focus, including watching movies on a regular basis, watching sporting events on a weekly

basis, and using a computer or the internet on a regular basis. (*Id.*). Plus, the ALJ noted that Deffinger seemed able to focus throughout the administrative hearing. As a result, the ALJ found that Deffinger's statements concerning the "intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at Tr. 16, #32). He thus afforded them little weight. (*Id.*).

After considering the evidence, the ALJ made the following findings of fact and conclusions of law:

1. Deffinger met the insured status requirements. (*Id.* at Tr. 12, #28).

2. Deffinger had not engaged in substantial gainful activity since June 22, 2013, her alleged onset date. (*Id.*).

3. Deffinger had severe impairments of depression and borderline intellectual functioning. (*Id.* at Tr. 13, #29).

4. She does not have an impairment or combination of impairments that meet or medically equals one of the impairments listed in the regulations. (*Id.*).

5. Deffinger has the RCF to perform light work, except being limited to: simple, routine tasks; simple, work-related decisions; frequent interaction with supervisors, occasional interaction with coworkers, and no interaction with the public as part of her job duties; and tolerating occasional changes in a routine work setting. (*Id.* at Tr. 14–15, #30–31).

6. She is unable to perform any past relevant work. (*Id.* at Tr. 19, #35).

7. She was forty-three-years-old on the alleged disability onset date. (*Id.*).

8. Deffinger has at least a high school education and can communicate in English. (*Id.*).

9. The transferability of her job skills is not material to determining her disability. (*Id.* at Tr. 20, #36).

9

10.     Considering Deffinger's age, education, work experience, and RCF, there are jobs that exist in significant numbers in the national economy that she can perform. (*Id.*).

11.     As a result, Deffinger cannot claim a disability. (*Id.* at Tr. 21, #37).

## PROCEDURAL HISTORY

On April 12, 2018, Deffinger filed a Complaint asking this Court to reverse the ALJ's decision. (*See* Doc. 1). The Court assigned the matter to a Magistrate Judge under Southern District of Ohio Civil Rule 72.2. *See also* Cincinnati Gen. Order No. 14-01 (referring appeals from decisions of the Commissioner of Social Security regarding Social Security benefits to Magistrate Judges). After considering all the evidence, on August 16, 2019, the Magistrate Judge issued her Report and Recommendation, recommending that this Court dismiss Deffinger's case. (Doc. 14). The Magistrate Judge concluded that the ALJ's findings were supported by substantial evidence and therefore afforded them great weight and deference. (*See* R&R at #744). Thus, she recommended that Deffinger's assignments of error be overruled and that this Court affirm the Commissioner's decision. (*Id.*). On August 23, 2019, Deffinger filed timely objections. (*See* Doc. 15). Those objections are now before this Court.

## LAW AND ANALYSIS

### A.    Standard Of Review.

If a party objects within the allotted time to a report and recommendation, the Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C.

§ 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b). Upon review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

But that is not the only relevant standard of review here. In this case, the Magistrate Judge was reviewing a decision by an ALJ employed by the Social Security Administration. Judicial review of such decisions is quite constrained. In particular, courts are "limited to determining whether the Commissioner's decision 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]").

Putting those two together, this Court's job is to review de novo whether the Magistrate Judge was correct in determining that the ALJ's decision applied the correct legal standards and was supported by substantial evidence. That is the task to which the Court turns now.

## B.  The Court Overrules Deffinger's Objections And Affirms The ALJ's Decision.

Deffinger groups her objections to the Magistrate Judge's Report and Recommendation into two categories. First, she claims that the Magistrate Judge erred in upholding the ALJ's determination as to Deffinger's RFC based on her mental impairments. Second, she appears to claim that the ALJ and the Magistrate Judge both erred in their consideration of how her subjective complaints should have

11

impacted her mental RFC. Both categories of Deffinger's objections are opaque, at best—particularly the latter of the two—but the Court will endeavor to construe them as favorably to her as it can. Even thus understood, however, both objections fail.

### 1. Mental Residual Functional Capacity Analysis.

Under the Social Security Act, the Social Security Administration established a five-step process for determining whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Deffinger objects to the Magistrate Judge's adoption of the ALJ's mental RFC analysis, which occurs at step three of that process. *See id.* at §§ 404.1520(a)(4)(iii), 404.1520(e), 416.920(e). An individual's RFC reflects her ability to do physical and mental work activities on a sustained basis despite the limitations that her impairments impose. *See id.* at § 416.945(a)(1). In making a finding as to the RFC, the ALJ is to consider all of the claimant's impairments, including impairments that are not severe. *Id.* at § 416.945(a); *see also* 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945; Soc. Sec. Ruling No. 96-8p, 1996 WL 374184 (Soc. Sec. Admin. July 2, 1996).

In her objections on the RFC issue, Deffinger argues that the ALJ and Magistrate Judge wrongly considered how Deffinger had only minimal restrictions on her daily living when assessing her mental RFC. This was wrong, she says, because how restricted she is in her daily living "shows not[h]ing about [her] ability to sustain any work for 40 hours a week in a competitive unskilled job." (Pl.'s Objs. to R&R of Magistrate J. ("Pl.'s Objs."), Doc. 15, #748). In essence, she is claiming that

12

the extent to which her impairments impact her daily life outside of work is entirely irrelevant to her mental RFC—which is meant to be a work-related metric.

That argument faces two problems. First, caselaw suggests that the ALJ should in fact review the impacts that an individual's impairments have on daily living as part of assessing the person's RFC. *See, e.g.*, *Newman v. Saul*, --- F. Supp. 3d ----, No. 19-11420-WGY, 2020 WL 4049915, at *14 (D. Mass. July 17, 2020) (rejecting the argument that the RFC assessment should not include consideration of a claimant's ability to participate in daily activities); *Green v. Comm'r of Soc. Sec.*, No. 2:20-cv-232, 2020 WL 4877187, at *7 (S.D. Ohio Aug. 20, 2020) (considering evidence of claimant's participation in daily activities as relevant evidence supporting "the ALJ's mental RFC analysis"); *Randolph v. Comm'r of Soc. Sec.*, No. 2:19-846, 2020 WL 3619682, at *4 (W.D. Pa. July 1, 2020) ("[T]he ALJ properly considered Plaintiff's … activities of daily living in reaching his RFC finding.").

Indeed, the court explained in *Barker v. Secretary of Health & Human Services*, 882 F.2d 1474 (9th Cir. 1989), that the administrative rules surrounding the determination of a claimant's RFC as to mental disabilities expressly call for consideration of the impact that those disabilities have on daily life activities. *Id.* at 1477 (noting that "Section 12.02, which pertains to organic mental disorders" requires a party to show that the condition "result[s] in at least two of the following" and then lists "marked restriction of activities of daily living" as one of the four).

If anything, the Social Security Administration's rules in that regard are even more clear today. The explanatory materials for Section 12 (which covers mental

13

disorders) direct the ALJ to consider four areas of mental functioning in determining an RFC, including the ability to (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.02B (2016). The materials explain that people "use the same four areas of mental functioning in daily activities at home and in the community that you would use to function at work." *Id.* Thus the materials note that the ALJ will consider "[i]nformation about your daily functioning" as it can "help us understand whether your mental disorder limits one or more of these areas; and, if so, whether it also affects your ability to function in a work setting." *Id.*

In short, the impact of Deffinger's impairments on her activities of daily living were relevant to the RFC analysis. The ALJ was correct to consider that information.

The record also contains substantial evidence supporting the use that the ALJ made of that information in assessing Deffinger's RFC. Both Drs. Tangeman and Lai acknowledged that Dr. Murphy examined Deffinger for a work-related evaluation in 2011, but did not begin seeing her for treatment until October 2014. (*See* Doc. 3-3, Tr. 108, 139, #125, #156). Both psychologists pointed out that Dr. Murphy indicated Deffinger had issues with frustration tolerance and concentration, but nevertheless opined that these issues had a minimal restriction on her activities of daily living. (*Id.* at Tr. 108, 139, #125, #156). Thus, they both concluded that Dr. Murphy's opinion was only "partially consistent" with Deffinger's own statements. (*Id.* at Tr. 108, 139, #125, #156). On reconsideration, Deffinger submitted Dr. Murphy's October 2014

14

"treatment summary," which Dr. Lai afforded "great weight" because it supported Deffinger's claims that her condition worsened. (*Id.* at Tr. 139, #156). In weighing both Dr. Tangeman and Dr. Lai's opinions, the ALJ also considered this "treatment summary." (*See* ALJ Hr'g Decision at Tr. 19, #35). The ALJ actually recognized that this later treatment summary supported Deffinger's claims and, as a result, the ALJ added additional limitations to the RFC regarding Deffinger's social functioning beyond those that Drs. Tangeman and Lai had assessed. (*See id.*). The record fully supported the ALJ's approach.

Next, Deffinger argues that the Magistrate Judge wrongly relied on Deffinger's statements to medical care providers in which Deffinger denied she suffered from mental health problems. (Pl.'s Objs. at #748). Deffinger points out that the ALJ found her depression to be a "severe" impairment. (ALJ Hr'g Decision at Tr. 13, #29). Plus, Deffinger argues a person with mental impairments frequently denies having such impairments, so the Magistrate Judge should not have relied on Deffinger's statements in assessing her disability claim. (Pl.'s Objs. at #748).

But that argument fails for at least two reasons. First, while Deffinger claims that *Blankenship v. Secretary*, 847 F.2d 1116 (6th Cir. 1988), supports her argument, in fact, it does not. Rather, *Blankenship* merely stands for the proposition that mental illnesses can be difficult to diagnose, and that, absent evidence to the contrary, the ALJ should not discount a diagnosis merely because it relies solely on the doctor's observations and the patient's statements. *See id.* at 1121. That is all well and good,

15

but it is hardly support for the notion that an ALJ cannot also consider a patient's statements to other healthcare providers.

Even putting that aside, Deffinger's statements denying her mental health problems were but one aspect of the evidence on which the Magistrate Judge (and the ALJ) relied in considering Deffinger's mental impairments. Both the Magistrate Judge and the ALJ also noted a "general lack of mental health treatment since the prior decision." (R&R at #735; ALJ Hr'g Decision at Tr. 17, #33). The Magistrate Judge explained that Deffinger's primary care provider prescribed her Cymbalta for depression in January 2014, but Deffinger did not provide evidence of any additional complaints to her primary care provider about depression. (R&R at #735–36; ALJ Hr'g Decision at Tr. 17, #33). Deffinger also testified that she saw Dr. Murphy for counseling in 2013 through 2014, but the ALJ found that she did not provide evidence to support this assertion. (ALJ Hr'g Decision at Tr. 18, #34; R&R at #736). The ALJ likewise found no record of any additional follow-up with Dr. Murphy beyond the October 2014 report. (ALJ Hr'g Decision at Tr. 18, #34). Thus, even if the Magistrate Judge did wrongly consider Deffinger's statements—Deffinger has not pointed the Court to any legal authority suggesting this was an error—the Magistrate Judge's analysis was still supported by the medical evidence (or lack thereof).

Deffinger also objects to the ALJ's decision, and thus the Magistrate Judge's agreement with that decision, on the grounds that the combination of low frustration tolerance, low stress tolerance, and poor concentration (i.e., her diagnosed impairments) does not translate into a mental RFC of simple, routine work with

16

occasional changes and occasional contact with others. (Pl.'s Objs. at #749 (citing ALJ Hr'g Decision at Tr. 14–15, #30–31)). In particular, Deffinger believes this determination does not properly account for her poor frustration tolerance and poor concentration, especially given the State Agency psychologists' finding that her complaints in this regard were "fully credible." (*Id.*).

As the Magistrate Judge pointed out, the ALJ is not required to accept the State Agency doctors' limitations entirely. (R&R at #736 ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinion verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale.")). The ALJ considered Dr. Murphy's interrogatories that said Deffinger had poor frustration tolerance and poor concentration, but assigned them little weight. The ALJ made this determination partly because "Dr. Murphy offered no supporting evidence for these claims and failed to elaborate on the briefly worded, rather ambiguous responses." (ALJ Hr'g Decision at Tr. 19, #35). Also, this report was "inconsistent with the rest of the medical record, which indicates the claimant repeatedly denied any mental health complaints, and the significant level of activity in which the claimant has engaged since the alleged onset date." (*Id.*). Considering the medical record as a whole, which is what the ALJ is required to do, the Court agrees that there is substantial evidence supporting the ALJ's RFC determination, and the Magistrate Judge was correct to affirm it. Thus, the Court overrules Deffinger's objection on this issue.

17

## 2.    Subjective Complaints.

On what Deffinger acknowledges is a related front, the Magistrate Judge also concluded that substantial evidence supported the ALJ's decision that the longitudinal medical evidence and Deffinger's lack of documented mental health treatment show that Deffinger's mental limitations were less severe than Deffinger described in her hearing testimony. (R&R at #742). Deffinger raises three objections to this finding. None are successful.

First, Deffinger argues the Magistrate Judge erred here by failing to consider that one reason for the gap in her efforts to obtain treatment from Dr. Murphy was due to her issues with workers' compensation. (*See* Pl.'s Objs. at #750). But that misses the point. The Magistrate Judge pointed out how Deffinger testified that she saw Dr. Murphy for counseling in 2013 and 2014, but she failed to submit those records as evidence. (R&R at #742). In other words, the Magistrate Judge was not raising suspicions about the gap in treatment per se, but rather indicating that Deffinger had failed to produce enough evidence to support her claims about the treatment that she had allegedly received. (*See id.* (noting that "the record only contained the August 2011 consultative evaluation with Dr. Murphy and the subsequent October 1, 2014 report stating that plaintiff met with Dr. Murphy for the first time since the evaluation" and that "[n]o other records from Dr. Murphy are present in the record even though plaintiff testified that she saw him for counseling in 2013-2014")). It is the claimant's burden to establish her treatment history. *Hicks v. Comm'r of Soc. Sec.*, No. 1:13-cv-425, 2014 WL 4748356, at *4 (S.D. Ohio Sept. 23, 2014) ("[I]t is ultimately Plaintiff's burden to ensure that medical evidence is

18

gathered and turned over to the agency."); *see also* 20 C.F.R. § 416.912(a)(1) (explaining that the claimant must prove to the Commissioner that she is disabled, and that the claimant must "submit all evidence" known to her that relates to whether or not she is disabled). And it appears that the ALJ and the Magistrate Judge were correct that Deffinger fell short on that front as to the treatment she allegedly received from Dr. Murphy.

Second, Deffinger once again claims the Magistrate Judge erred by considering how Deffinger, herself, had denied that she had problems with anxiety and depression. (Pl.'s Objs. at #750 (citing R&R at #742)). Deffinger claims this shows the Magistrate Judge's general "lack of insight into nervous impairments." (*Id.*). But it would be an odd rule if, in considering the extent of a claimant's psychological disorders—which are in part diagnosed based on the information the claimant provides her treating psychologist—an ALJ cannot at least *consider* other statements that the claimant made about such issues in the course of seeking other medical treatment. In any event, here the ALJ did not take Deffinger's denials that she had a "nervous impairment" as gospel. Despite the numerous medical records in which Deffinger denied having depression issues, (*see* ALJ Hr'g Decision at Tr. 17, #33), the ALJ "nevertheless gave the claimant the benefit of the doubt that she had some worsening of her mental health impairments, as reported on the single occasion where she met with Dr. Murphy and her statements in this case." (*Id.* at Tr. 19, #35). Indeed, the ALJ "added new limitations on the claimant's social functioning" based on that worsening, as previously explained. (*Id.*). In short, the ALJ did not improperly

rely on Deffinger's statements, and certainly not to the exclusion of other evidence. Rather, the ALJ's conclusion is supported by substantial evidence, which is the only question here.

Lastly, Deffinger raises basically the same objection she raised under the mental RFC analysis—that the Magistrate Judge and ALJ erred by considering Deffinger's activities of daily living because they do not relate to her ability to work reliably for 40 hours a week in a competitive job. (Pl.'s Objs. at #750). She further argues her testimony about her activities of daily living is credible and, in combination with her allegedly worsened nervous impairments, means "she cannot sustain any work for 40 hours a week and is disabled." (*Id.* at #751).

But, as discussed above, the claimant's ability to participate in the activities of daily living *are* relevant to the analysis. Regulation 404.1529(c)(3)(i) specifically states that "daily activities" are considered when evaluating a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3)(i). Nor did the ALJ rely on such evidence to the exclusion of other evidence. Rather, non-medical evidence, like the nature of Deffinger's participation in activities of daily living, was merely one of several categories of evidence the ALJ considered, all of which together led the ALJ to decide that Deffinger did not qualify for disability benefits. (*See* ALJ Hearing Decision at Tr. 18, #34). And those factual findings are supported by substantial evidence, as already discussed.

## CONCLUSION

Because the ALJ's decision is supported by substantial evidence and followed the correct legal standards, the Court concludes that Deffinger's objections are without merit. Based on the foregoing, the Court **ADOPTS** the Magistrate Judge's R&R, **DISMISSES** Deffinger's Complaint (Doc. 1) **WITH PREJUDICE**, and **DIRECTS** the Clerk to terminate the case.

**SO ORDERED.**

September 3, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**